FILED

JUN 20 2008

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re<br><br>Jason B. Shinn and<br>Cynthia M. Shinn,<br><br>          Debtors. | Case No. 07-14013-B-13<br><br>DC No. MHM-1 |

**MEMORANDUM DECISION REGARDING TRUSTEE'S
OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN**

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

Peter L. Fear, Esq., appeared on behalf of the debtors, Jason B. Shinn and Cynthia M. Shinn (the "Debtors").

Michael H. Meyer, Esq., appeared in his capacity as the chapter 13 trustee (the "Trustee").

      Before the court is the Trustee's objection to confirmation of the Debtors' chapter 13 plan (the "Plan"). Prior to commencement of this case, co-debtor, Cynthia M. Shinn ("Cynthia") executed a quitclaim deed transferring and releasing to her parents any interest she may have held in the parents' residence located in Murrieta, California (the "House"). The Trustee asserts that the transfer could be



avoided by a chapter 7 trustee if this were a chapter 7 case and that the Plan does not distribute to creditors the value of Cynthia's interest in the House. The Trustee contends that the Plan therefore fails to comply with 11 U.S.C. § 1325(a)(4)[1] (the "best interests of creditors test"). For the reasons set forth below, the objection will be overruled.[2]

This Memorandum contains findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52 (made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052). The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 1325. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

**<u>Background: Findings of Fact.</u>**

The facts here are not in dispute. Cynthia is the eldest of five children. While Cynthia and her siblings were growing up, their father, Medardo Espinoza ("Medardo"), held various jobs including that of farm worker and truck driver. The family lived in a variety of temporary housing arrangements until 1988 when the House was purchased.

Initially the House was to be titled in the name of Cynthia's parents, however, they were unable to qualify for a loan. At that time, Medardo was making approximately $8.00 per hour. Cynthia, age 21, was employed full-time in a medical office making approximately $10.00 per hour. Her sister, Veronica, was

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *after* October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

[2] The Trustee also objected to confirmation of the Plan on the grounds that it does not devote all of Debtors' disposable income to pay unsecured creditors. (§ 1325(b)(1)(B)). The Trustee contested the Debtors' deduction of 401(k) contributions and loan repayments. After the hearing, the Trustee withdrew that objection.

almost 19 years-old and was working full-time as a sales clerk making approximately $5.00 per hour. In order for the parents to qualify for a loan to purchase the House, the names of both Cynthia and Veronica were added to the loan application and the title documents, each as holders of a one-fourth interest. Cynthia's and Veronica's names remained on title through at least two subsequent refinances. At all times, Cynthia, Veronica, and their parents understood and intended that the House belonged to the parents.

Cynthia's parents were unable to make the $6,000 down payment for the House. Veronica funded the down payment by depositing a check into the escrow. Veronica always understood the deposit to be a gift to her parents and never requested or expected repayment. The monthly mortgage payment was approximately $1,100 with the insurance. Prior to acquisition of the House, Cynthia paid $150 per month to her parents to help fund the living expenses. After the House was purchased, Cynthia increased her contribution to $200 per month. That arrangement continued until 1997 when she married and moved out of the House. Veronica also lived in the House and contributed about $200 per month toward family expenses until 2003 when she too married and moved. There was no evidence to suggest that Cynthia paid more than her fair share of the household expenses. Neither Cynthia nor Veronica made any financial contributions to their parents after they moved out of the House.

Cynthia's name was on the mortgage documents and the property tax records, but she never made a payment to the mortgage company or to the county taxing authority. There was no evidence tracing her financial support directly to the House. On at least one occasion, while she still lived in the House, in 1994, Cynthia claimed an itemized income tax deduction for the mortgage interest and property taxes; the total deduction was $9,366. She did so based on the advice of the family's tax preparer, because Cynthia had the highest family income and

would realize the largest tax refund from the deduction. There was no evidence that Cynthia took any tax deductions related to the House after she moved out in 1997.

As early as 2003, Cynthia's parents approached her and Veronica and asked them to release their names from the House's title. The parents wanted to set up an estate plan with a "special needs trust" for the benefit of their brother who was affected by Downs Syndrome. They agreed, but suggested that the parents wait until they had executed a will and completed their estate planning. The estate planning was not finished when Cynthia and her husband decided to seek bankruptcy protection in late 2007. Within a short time before filing the bankruptcy petition, Cynthia executed the quitclaim deed in favor of her parents. Sometime later, Veronica also released her name from the House's title.

Only three witnesses testified at trial, Cynthia, Veronica, and Medardo. Their testimony was consistent and credible. All agreed that the intent of titling the House with Cynthia's and Veronica's names was to help the parents qualify for financing and have a permanent home. Cynthia and Veronica never believed they were entitled to any ownership, or beneficial interest, in the House and they always understood that if the House was sold the money would belong to their parents. Medardo also testified that he never intended to give his two daughters an ownership interest in the House.

This bankruptcy was filed as a voluntary petition under chapter 13 on November 30, 2007. The Debtors' schedules list an ownership interest in two properties located in the state of Washington. The Debtors did not schedule any interest in the House, however, they fully disclosed the quitclaim transaction releasing Cynthia's interest in the House. The Debtors' Plan provides for payments of $200 per month over the term of 36 months. It will distribute approximately 5% to unsecured creditors, a total distribution of approximately

$4,059. The Trustee contends without supporting evidence that Cynthia's one-fourth interest in the House was worth substantially more than the Plan will pay to unsecured creditors. The Trustee timely filed this objection to confirmation of the Plan.

**Issue.**

The general issue is whether Cynthia's creditors will receive through the Plan at least as much as they would receive if this case was filed under chapter 7. (§ 1325(a)(4)). The specific issue is whether it is likely that a chapter 7 trustee could avoid the transaction between Cynthia and her parents and recover some value from the House for distribution to unsecured creditors.

**Analysis: Conclusions of Law.**

**Applicable Law.**

One fundamental element of confirmation of a chapter 13 plan is the "best interests of creditors test," otherwise known as the "chapter 7 liquidation test." It is stated in § 1325(a)(4) as follows:

> [T]he court shall confirm a plan if–
>
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date.

The debtor has the ultimate burden of proof to establish that each element of confirmation has been satisfied. *In re Barnes*, 32 F.3d 405, 407 (9th Cir. 1994), citing *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443-44 (9th Cir. 1986). However, application of the "best interests test" rests with the discretion of the bankruptcy court. 8 *Collier on Bankruptcy*, (15th Ed. Revised), ¶ 1325.05[1], at 1325-17, citing *Farkas v. Katz*, 54 F.2d 1061, 1062 (5th Cir. 1932).

Section 1325(a)(4) requires the court to hypothesize a chapter 7 liquidation of the debtor's estate on the effective date of the Plan. 8 *Collier on Bankruptcy*

(15th Ed. Revised), ¶ 1325.05[2][a], at 1325-18. A chapter 7 trustee has the power, indeed the duty, to "collect and reduce to money the *property of the estate* for which the trustee serves." (Emphasis added.) (§ 704(1)). A chapter 7 trustee also has certain powers to "avoid" prepetition transactions affecting the debtor's interest in property, and recover that interest, or its equivalent value for the benefit of creditors. (§§ 544, 547, 548 & 550). Any property which the trustee recovers through his/her avoiding powers also becomes property of the estate. (§ 541(a)(7)). Therefore, the court must look at this case as if it were filed under chapter 7 and try to determine what assets, if anything, a chapter 7 trustee might be able to acquire through the exercise of his/her powers.

Whether property belongs to the debtor, and therefore becomes part of the bankruptcy estate, is determined by state law. *U.S. v. Lawrence*, 189 F.3d 838, 845 (9th Cir. 1999). The term "property of the estate" is broadly construed. *In re Bialac*, 712 F.2d 426, 430 (9th Cir. 1983). However, in the case of certain "legal" interests, "property of the estate" is statutorily limited by § 541(d) which provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

Likewise, when a debtor possessed and conveyed away nothing beyond bare legal title to property prior to commencement of the case, the bankruptcy estate cannot acquire any equitable interest in the property and there is nothing that the trustee can recover for the estate. *Torrez v. Torrez (In re Torrez)*, 827 F.2d 1299, 1303 (9th Cir. 1987).

The Trustee suggests here that a chapter 7 trustee could avoid Cynthia's quitclaim deed and recover Cynthia's interest in the House, sell the House for more than any liens against it, and ultimately distribute one-fourth of the net

6

proceeds to Cynthia's creditors. To accomplish that result, a chapter 7 trustee would have to successfully litigate an adversary proceeding against the parents. (Rule 7001(1) & (3)). However, this is a chapter 13 contested matter, it is not an adversary proceeding, and the parents are not parties to this dispute. The Trustee need not, indeed cannot, actually avoid the quitclaim transaction; he needs only to make an initial showing that a chapter 7 trustee "could be reasonably expected to succeed" in achieving that result. *In re Larson*, 245 B.R. 609, 615 (Bankr.D.Minn. 2000). Conversely, the Debtors, who have the ultimate burden of proof, must come forward with evidence to establish only that recovery and sale of the House in a chapter 7 proceeding are not reasonably likely.

### The Resulting Trust and Unjust Enrichment.

This court must determine whether Cynthia held any interest in the House beyond the bare legal title evidenced by her name on the tax title and loan documents. The Debtors argue in support of confirmation that Cynthia did not, and that her interest was subject to a resulting trust in favor of her parents. The evidence in support of the Trustee's objection consists of undisputed testimony that (1) the family never executed a written trust agreement relating to the House, (2) Cynthia contributed to the family's expenses while she lived in the House, and (3) at least once, Cynthia took itemized deductions for the property tax and mortgage interest payments on her income tax returns.

Evidence offered in support of confirmation establishes that (1) Cynthia's and Veronica's names were placed on title to the House for a proper purpose, to help the family acquire financing for a permanent home, (2) Cynthia did not directly make any mortgage, insurance or tax payments on the House, (3) Cynthia stopped contributing to household expenses when she moved out of the House ten years before the bankruptcy, (4) nobody in the family ever intended that either Cynthia or Veronica would actually own any portion of the House, and (5)

Veronica was not treated any more favorably than Cynthia when the time came to release their interests in the House. There was no evidence of fraud, preferential treatment, inappropriate conduct, or any effort to divert, or hide assets from Cynthia's creditors.

On similar facts, the Ninth Circuit held in *Torrez* that when the debtor possessed nothing more than bare legal title, to property which someone else paid for, a resulting trust is found to exist under California law for the benefit of the person who paid for the property. Moreover, the court observed that the bankruptcy estate would be unjustly enriched if the debtor was allowed to recover the property. *Torrez*, 827 F.2d at 1301-03.

The purpose of a resulting trust is to enforce the intention of the parties, as opposed to a constructive trust, which can be imposed to rectify some fraudulent conduct. *Hernandez v. Ruelas (In re Marriage of Ruelas)*, 154 Cal.App.4th 339, 342, 64 Cal.Rptr.3d 600 (2007). Under California law, a resulting trust is presumed to result from the facts when a transfer of property is made to one person and consideration for the property is paid by another. *Id.* It arises by operation of law and is not dependant on an expressed agreement of intent. *Id.*

The factual scenario presented here is not uncommon. A review of California case law offers a variety of "resulting trust" cases, published and unpublished, where title to real property was transferred to a family member by elderly parents to qualify for a loan, or for some purpose other than a gift or to convey ownership. *See Marriage of Ruelas*, (supra) 154 Cal.App.4th 339; *Sykes v. Sykes*, 2004 WL 803279; *Johnson v. Johnson,* 192 Cal.App.3d 551, 237 Cal. Rptr. 644 (1987); *McCosker v. McCosker*, 122 Cal.App.2d 498, 265 P.2d 21 (1954); *Solomon v. Walton*, 109 Cal.App.2d 381, 241 P.2d 49 (1952).

In *Torrez*, the debtors' parents, John and Jessie Torrez, placed title to 120 acres of farm property in the debtors' name in order to exceed their maximum

8

allotment of federally subsidized irrigation water.[3] John and Jessie made the down payment for the property and paid all of the property taxes, made all of the mortgage payments, improved the property, and employed a worker to farm the land. When it became clear that the debtors were headed into financial difficulty, the parents directed the debtors to convey the property to another family member. The debtors subsequently filed for bankruptcy protection under Chapter 11 and tried to recover the property as a fraudulent conveyance to help finance their reorganization.

John and Jessie intervened in the adversary proceeding and counter-claimed, *inter alia*, for quiet title on a "resulting trust" theory. The debtors argued against the parents that such a trust would be void based on the purported "illegal" purpose for which the property was placed in the debtors' name in the first place. The trial court ruled for the debtors on the illegality issue. The Bankruptcy Appellate Panel reversed, rejecting the illegality argument and upholding a resulting trust for John and Jessie. The Ninth Circuit affirmed.

The Ninth Circuit reviewed the factors which govern the judicial recognition of "illegal" agreements and concluded that the "illegality" does not by itself negate the parents' interest in the property, that forfeiture of the property would greatly exceed the penalties imposed by the government for violation of the applicable law, and that the granting of relief for the debtors would unjustly enrich them at the parents' expense:

/ / /

---

[3] Federal statutes limited the right to receipt of federally subsidized irrigation water to landowners of parcels not exceeding 160 acres. 43 U.S.C. §§ 423e, 431, 434. Farmers who owned more than 160 acres could not receive federally subsidized water for the additional acreage. *See* 43 C.F.R. § 426.6(h). John and Jessie were already receiving their maximum allotment of federally subsidized water before they purchased the property in the debtors' name. *Torrez*, 827 F.2d 1299 n.1.

9

> Most compelling is the likelihood of unjust enrichment of the Debtors at the expense of John and Jessie were we to uphold their defense of illegality. The Debtors have attempted to better their own position at the expense of their parents, who paid for the land, borrowed against it, and worked it. For the Debtors to benefit now from the sale of property upon which they have never paid a cent of consideration, nor worked, nor otherwise expended any effort whatsoever, would amount to enrichment which could be described only as unjust. As to disproportionality, the Debtors ask a forfeiture for conduct which would otherwise entail mere disentitlement to federally subsidized irrigation water--a highly disproportionate result. In this case, equitable principles guide us. Bankruptcy is an equitable proceeding in which equity operates within terms of the Bankruptcy Code. [Citations omitted.]

*Torrez*, 827 F.2d 1299, 1301-02.

Here, as in *Torrez*, it is undisputed that Cynthia contributed nothing to initially purchase the House, she made none of the mortgage payments or property tax payments, she did not contribute directly to any improvements or maintenance expenses. Even though Cynthia contributed financially to the household living expenses during the years she lived there, the court can find nothing unusual or inappropriate about that arrangement. Indeed, it would seem unusual for an adult child living at home, with no dependents, earning more than her parents, as Cynthia did, *not* to contribute financially to the household.

The Trustee argues that the lack of a written agreement between the parties bars the application of any "trust" defense. However, the resulting trust is an equitable doctrine which can be applied to prevent unjust enrichment; it can arise by operation of law and does not require a written agreement. The Trustee further contends that Cynthia's interest in the House is established by her use of the income tax deductions in 1994. However, that does not give rise to a bankruptcy

10

issue. If it is an issue at all, then it is a matter to be addressed between Cynthia and the Internal Revenue Service. Even if such deductions were improper, the appropriate remedy, possibly some penalties, would not include forfeiture of the House. Bankruptcy is an equitable proceeding in which equity operates within the terms of the Bankruptcy Code. *Torrez*, 827 F.2d at 1302. Forfeiture of the House would be a highly disproportionate result. *Id.* On these facts, it is difficult for the court to see how forfeiture of the House, even one-fourth of the House, would not unjustly enrich the bankruptcy estate.

A resulting trust is an "intention enforcing" remedial device. Clearly, the intention of Cynthia and her family was that Cynthia would not own any interest in the House. The main difference between this case and *Torrez* lies in the fact that the parents placed Cynthia on the title to the House for a lawful purpose - to help obtain financing. Cynthia's name was left on the title for a lawful purpose - to facilitate the family's estate planning goals. Based on that distinction, the equitable principles in *Torrez* become even more compelling. The court is satisfied that no assets which should have gone to pay creditors have been diverted to the House.

**Conclusion**.

Based on the foregoing, the court is persuaded that if this case were filed under chapter 7, it is not reasonably likely that a chapter 7 trustee could avoid Cynthia's quitclaim deed and sell the House for the benefit of creditors. Accordingly, the court is satisfied that the Plan complies with § 1325(a)(4). The Trustee's objection will be overruled.

Dated: June 20, 2008

W. Richard Lee
United States Bankruptcy Judge

11